ESTATE OF ROBERT M. HALL, DECEASED, HELEN S. HALL, ADMINISTRATOR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Hall v. Commissioner
Docket No. 19992-80.
United States Tax Court
T.C. Memo 1983-355; 1983 Tax Ct. Memo LEXIS 433; 46 T.C.M. (CCH) 479; T.C.M. (RIA) 83355; June 16, 1983. Donald D. Chapman, for the petitioner. Lewis R. Carluzzo, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency in the estate tax of the Estate of Robert M. Hall, deceased, *434 Helen S. Hall, administrator, in the amount of $110,526.33. Some of the issues raised by the pleadings have been disposed of by agreement of the parties, leaving for our decision only the value, if any, at which 7,000 shares of Merck & Co. stock should be included in the gross estate where this stock was pledged to secure loans made by a bank to a corporation in which the decedent had previously been a shareholder. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The estate of Robert M. Hall, deceased, Helen S. Hall, administrator, timely filed a Federal estate tax return with the Internal Revenue Service Center, Memphis, Tennessee. [1] At the time the petition was filed in this case, Helen S. Hall resided in McLean, Virginia. Robert M. Hall (decedent) died intestate on November 29, 1976. He was survived by his wife, Helen S. Hall, and his three daughters. Mrs. Hall subsequently was duly appointed as the administrator of Mr. Hall's estate. At the date of his death decedent owned 29,415 *435 shares of Merck & Co. common stock. Of these shares, 7,000 were pledged as security for a loan as hereinafter more fully set forth. At all times relevant herein, Merck & Co. stock was traded publicly on the New York Stock Exchange. In May 1974, decedent and Mrs. Hall entered in a business venture with an individual named Steven J. Hunter and his wife, June W. Hunter. The purpose of the venture was to acquire and renovate a 10-story apartment building in Ventnor, New Jersey, and to sell the renovated apartments as condominiums. Ventnor is located directly south of and adjacent to Atlantic City, New Jersey. Decedent and Mr. Hunter formed a corporation, Cambridge Corporation, to carry out the venture. The building to be renovated was acquired by the corporation at a foreclosure sale conducted by the Bank of New Jersey (the Bank). The Bank sold the building to the Cambridge Corporation for its bid of $2.1 million and took back a promissory note from the corporation dated June 11, 1974, for the sale price, secured by a first trust against the property. One of the conditions of this sale and financing was that Cambridge Corporation obtain construction financing from the Bank. *436 The Hunters held 60 percent of the outstanding stock of Cambridge Corporation and the Halls held the remaining 40 percent. Decedent transferred $50,000 to Cambridge Corporation in return for his shares in the corporation. In January of 1975 Cambridge Corporation obtained construction loans from the Bank with which to finance the renovation of the building by executing two promissory notes. The first note, dated January 14, 1975, in the amount of $400,000 was secured by 8,000 shares of Merck & Co. stock owned by decedent. [2] Decedent was entitled to receive the dividends on this stock while it was hypothecated. *437 Mr. Hunter was the manager-in-residence at the building. The construction work needed for the renovation of the building was performed by Mr. Hunter's corporation, the Hunter Construction Corporation. The construction funds obtained by Cambridge Corporation from the Bank were expended. The payments on the debts of Cambridge Corporation were in arrears by mid-1975. Decedent was notified by the Bank in a letter dated September 11, 1975, that interest payments on the $400,000 loan were delinquent in the amount of $20,266.72 as of August 21, 1975, and interest would continue to accrue at the rate of $133.33 per day thereafter. The letter stated that the Bank would liquidate the collateral if the loan was not brought to a current status. In mid-1976 decedent resigned from his positions as an officer and a director of Cambridge Corporation and undertook to disassociate himself from the venture. Decedent and Mr. Hunter reached an agreement in November of 1976 in which decedent and Mrs. Hall sold their shares of stock in Cambridge Corporation to Mr. and Mrs. Hunter for a nominal consideration, and Mr. Hunter was to obtain new financing from the Bank under the condition that the *438 Bank would release the pledged Merck & Co. stock to decedent over a 10-year period. Subsequent to the time Mr. Hunter and decedent had reached an agreement contingent on Mr. Hunter's obtaining new financing from the Bank but prior to the time the Bank agreed to extend such additional financing, decedent died. In a commitment letter dated December 3, 1976, the Bank agreed to make an additional loan of $1,050,000 to Cambridge Corporation, secured by the personal guarantee of Mr. and Mrs. Hunter, a third trust on the building, and, as additional collateral, the 8,000 shares of Merck & Co. stock held by decedent's estate. The 8,000 shares of stock were to be collateral that could be used to correct any deficiency in the schedule of debt service on the overall loan then totaling $3,350,000. Decedent's estate was to receive back 1,000 shares of the stock when the new financing was accomplished, and a specified number of shares were to be returned to the estate each year thereafter until all shares were returned at the end of 10 years. All releases of stock per the schedule were contingent upon the total loan from the Bank being current in all respects, including all payments of interest *439 and principal due. Additionally, it was required that all taxes and water and sewer payments be up-to-date. The commitment letter, which recited a provision similar to that in the agreement between the Halls and the Hunters, further stated: In the event the Hunters are unable to cause the bank to release the pledged stock pursuant to the foregoing schedule, the Hunters will post substitute collateral sufficient to cause the bank to release the shares, or if not reasonably possible, will purchase similar Merck and Company stock on the market and deliver it to Robert M. Hall's Executor's nominee instead of the pledged stock, in which event Robert M. Hall's Executor's nominee shall assign to the Hunters the same number of pledged shares still being held by the bank. In the event of bankruptcy of the Hunters or the corporation and this agreement is in default to the Halls', then or thereafter as defined in Paragraph 8 of the Hall-Hunter Agreement, the Halls shall be creditors of the Hunters and the corporation. As of December 28, 1976, the status of the three loans previously taken out by Cambridge Corporation was as follows: (1) The $2.1 million purchase loan was in arrears *440 in interest from September 1, 1974, to December 28, 1976, in the amount of $352,733.38; (2) the $400,000 construction loan was in arrears in interest from April 15, 1975, to December 28, 1976, in the amount of $85,531.18; and (3) the $200,000 construction loan was in arrears in interest from January 20, 1975, to December 28, 1976, in the amount of $30,406.62. In addition to these arrearages in interest payments, there was an outstanding mechanic's lien of $825.88 on the building, a lien for materials in the amount of $4,925.02 and taxes due in the amount of $1,160.66.The arrearages in the interest and the liens and taxes stated above were paid off as a result of the Bank extending new financing to Cambridge Corporation on December 30, 1976. At the time this new financing was extended to Cambridge Corporation, the referendum for casino gambling in Atlantic City had just been passed, but it would be several years before casino operations would actually commence. The following table summarizes the monthly statements of operations of Cambridge Corporation for the months from January 1977 to May 1977, inclusive: January
* $1,209.39 February
(4,797.81)
March
(6,172.57)
April ** (6,994.04)
May ** (8,562.00)
*441 The monthly debt service payments to be made to the Bank by Cambridge Corporation were in default beginning with the payment due on April 1, 1977, and continuing with the payment due for each of the months thereafter in 1977. The alternate valuation date, May 29, 1977, was elected by decedent's estate for valuation of the estate assets. The fair market value of Merck & Co. common stock on May 29, 1977, computed on the basis of the mean between the high and low price on the New York Stock Exchange on that date was $50.82 per share. The 7,000 shares of Merck & Co. stock in issue would, therefore, ignoring its being pledged, have a fair market value of $355,740. As of May 29, 1977, there were various judgments and memorandums of attachment against the Hunters, individually and jointly and in their corporate name, in Arlington County, Virginia, alone in the total amount of $110,869.15. A suit then pending against the Hunters and others in Charlottesville, Virginia, resulted in a judgment being entered for *442 $717,533.18 on October 5, 1977. A memorandum of attachment was filed subsequently in Arlington County, Virginia, on September 19, 1977, in the amount of $127,541.76. On October 11, 1977, the Bank filed foreclosure proceedings alleging the following arrearages in debt service payments: (1) The $2.1 million purchase loan was in default in the amount of $11,166.67 per month from April 1, 1977; (2) the $200,000 construction loan was in default in the amount of $11,166.67 per month from April 1, 1977; and (3) the additional $1,050,000 loan obtained in the new refinancing was in default in the amount of $11,166.67 per month from April 1, 1977. Subsequent to this foreclosure proceeding being instituted by the Bank, a new group of individuals took over the building from Cambridge Corporation. Decedent's estate and the Bank had reached an agreement under which the Bank agreed not to foreclose against the Merck & Co. stock at that time in return for decedent's estate making a loan of $80,000 to the persons taking over the building. Under this agreement a specified number of shares was to be returned to decedent's estate over a certain period if the debts owed to the Bank were *443 being paid according to schedule. As of the date of the trial in February of 1982, decedent's estate had received 4,000 shares of the pledged Merck & Co. stock from the Bank. If the debts owed to the Bank continue to be repaid according to schedule, the estate was to receive the remaining 3,000 shares from the Bank in July 1982. On the original estate tax return, dated August 26, 1977, the estate valued the 7,000 pledged shares of Merck & Co. stock at a fair market value of $53,361. The return contained the following statements as to the valuation made of the 7,000 shares: It is very speculative as to whether or not the estate will recover any more of the stock. While land values in the Atlantic City area have increased in the past year, the Cambridge Corporation has consistently operated at a deficit. The pledged stock is reported in this return at 15% of its value on the alternate valuation date. The Bank of New Jersey has been making an appraisal of what would be fair market value of the stock, but the report of the appraisal has not been received. Upon receipt of the appraisal, a final return will be made. In its amended estate tax return dated March 29, 1979, the *444 estate returned the 7,000 shares as having no value. The following statement is contained in the amended return: The pledged stock is listed at no value in the schedule because the decedent's estate is not liable for the indebtedness. The value of the stock at $50.83 is $355,810.00. The indebtedness which it secures is $3,350,000.00. Accordingly, the asset is reported at no value. Regulation 20.2053-7. Respondent in his notice of deficiency determined that the 7,000 shares should have been valued at an amount which represented the mean trading price of Merck & Co. common stock on the New York Stock Exchange as of the alternate valuation date. OPINION Although the original estate tax return reported the 7,000 shares of pledged Merck & Co. stock at a fair market value of $53,361, petitioner now contends that the proper value is zero. Respondent takes the position that the value of the 7,000 shares is the mean between the high and low price at which Merck & Co. stock sold on the New York Stock Exchange on May 29, 1977, the alternate valuation date. [3] Petitioner states that since the unencumbered value of the stock on May 29, 1977, $355,740, is far exceeded by the $3,350,000 *445 face amount of the debts which the stock secured, the stock had no value on that date.Respondent, on the other hand, asserts that since decedent held the legal title to the stock at the date of his death, the stock should be included in the gross estate at the amount determined in the statutory notice because petitioner has not made an adequate showing of the extent to which the existence of the pledge agreement diminished the value of the stock. *446 The record indicates that prior to the first refinancing by the Bank in late December of 1976, Cambridge Corporation was having difficulty selling sufficient condominium units in the building to generate the funds needed to successfully complete the renovation. Mr. Hunter had begun to rent out certain units in the building as apartments in order to obtain rental income to help Cambridge Corporation meet its expenses. Subsequent to the refinancing by the Bank, beginning April 1, 1977, the loans for which the stock was pledged were against in default. Additionally, as of the valuation date several judgments and memorandums of attachment had been filed against Mr. and Mrs. Hunter, the parties who personally guaranteed the loans. The parties have stipulated to the testimony of Robert N. Fitzgerald, a vice president of the Bank, who handled the loans made by the Bank to Cambridge Corporation. The parties stipulated that if Mr. Fitzgerald had been called to testify he would testify that in his opinion, if the building had been sold at foreclosure in 1977, the pledged stock would not have been sufficient to cover the deficiency. Mr. Fitzgerald, it is stipulated, would also testify *447 that Mr. and Mrs. Hunter's personal guarantee of the debts of Cambridge Corporation was valueless due to their financial situation. The parties state that Mr. Fitzgerald's opinion as to the valuelessness of the guarantee would be based upon the following: (1) His general knowledge of the Hunters; (2) his knowledge that the Hunters had numerous local creditors; (3) his belief that Mr. Hunter had no source of income other than the project; (4) the fact that the Hunters refused to invest any personal funds in the project; (5) the fact that the Hunters' personal residence was secured by three mortgages; and (6) his belief that the Hunters were using loan advances for personal reasons. [4]
*448 In our view the 7,000 shares of Merck & Co. stock should be valued at the amount a willing buyer would pay a willing seller, both being reasonably knowledgeable of the facts, including the fact that the stock was pledged for an indebtedness of Cambridge Corporation. [5] The situation here is in some ways similar to the situation involving the stock in , affg. , in which the court stated: Petitioner contends that the stock had no fair market value, because its use by the petitioner to guarantee performance of its agreement restricted its re-sale. . However, the sale of the stock was not forbidden by the agreement; the sole effect of the restriction imposed was that a purchaser would take subject to the terms of the agreement. Such a restriction may reduce, but does not destroy, the fair market value. [1] * * * Likewise in the instant case, decedent's interest in the stock could be sold, although the stock would remain as collateral. One of decedent's rights in the stock was *449 to receive the dividends while the stock was pledged. In our view, the 7,000 shares as encumbered by the pledge had some value but did not have the same value as similar unencumbered shares. The encumbrance reduced the value substantially but did not, as petitioner contends, make the decedent's interest in the shares have no value whatsoever on the valuation date. In the original estate tax return the 7,000 shares were reported at a value equal to 15 percent of the value of similar unencumbered shares. [6]
*450 In December of 1976, the referendum for casino gambling in Atlantic City had just been passed. The passage of such referendum in our view would have a definite, positive impact on land values in adjacent Ventnor, New Jersey. Moreover, Cambridge Corporation in its monthly statements of operations disclosed that for the period from January 1977 to May 1977 it received monthly rental income of between $22,000 and $25,000. The building was therefore capable of generating a fair amount of income, although not a sufficient amount to meet the loan payments and other expenses. From this record we conclude that as of the valuaton date there did exist some possibility of eventually making the condominium project a financial success if additional capital or further financing could be obtained. Subsequent to the Bank's instituting foreclosure proceedings in October of 1977, a new group took over the building from Cambridge Corporation. However, the Bank, in a separate agreement with decedent's estate, required the estate to make a loan of $80,000 to this new group of people in consideration for not foreclosing on the stock. Based upon all the evidence of record, including the prospects *451 of the building located where it had a probability of proving a successful venture, the 10-year period for the complete release of the stock, and the fact that decedent's estate was entitled to the dividends on the stock, we find that the 7,000 shares of Merck & Co. common stock in its pledged state as of the alternate valuation date had a fair market value of $71,148, which is an amount equal to 20 percent of the fair market value of unencumbered shares. In reaching this valuation, we have recognized that the stock was pledged for loans totaling over $3,350,000 and was subject to being foreclosed upon for deficiencies in payments on those loans. However, we conclude that there was as of the valuation date a reasonable prospect of making the condominium project, the primary security for these loans, an eventual success. Decision will be entered under Rule 155.
Footnotes
1. This return was marked "tentative" and on or about April 12, 1979, an amended return was filed for the Estate of Robert M. Hall, deceased.↩
2. Seven thousand of these eight thousand shares are the subject of the instant case. The second note in the amount of $200,000, dated January 20, 1975, was executed by Cambridge Corporation, and secured by a second trust on the building. Simultaneously, Mr. Hunter and his wife executed personal guarantees of the original $2.1 million note given to the Bank at the foreclosure sale and the second $200,000 note. Under the terms of the hypothecation of the Merck & Co. stock, the stock was collateral only for the $400,000 loan, but the stock was not to be released until the $200,000 second trust note was paid. However, decedent could regain possession of the stock by paying the $400,000 indebtedness.↩
*. No debt service payments had been due or were made. ** Amounts determined as if $17,166.67 monthly payments required for debt service and taxes had been made.↩
3. Petitioner alternatively contends that if the full value of the shares, ignoring the pledge agreement, is included in the gross estate then a deduction should be allowed for the debts which the stock secured. The debts for which the stock was pledged were not the debts of decedent but those of Cambridge Corporation. Decedent was not liable for these debts, even as a guarantor. Therefore, this alternative approach suggested by petitioner is contrary to the provisions of sec. 20.2053-7, Estate Tax Regs. This regulation provides in pertinent part as follows: Deduction for unpaid mortgages. A deduction is allowed from a decedent's gross estate of the full unpaid amount of a mortgage upon, or of any other indebtedness in respect of, any property of the gross estate, including interest which had accrued thereon to the date of death, provided the value of the property, undiminished by the amount of the mortgage or indebtedness, is included in the value of the gross estate. If the decedent's estate is liable for the amount of the mortgage or indebtedness, the full value of the property subject to the mortgage or indebtedness must be included as part of the value of the gross estate; the amount of the mortgage or indebtedness being in such case allowed as a deduction. But if the decedent's estate is not so liable, only the value of the equity of redemption (or the value of the property, less the mortgage or indebtedness) need be returned as part of the value of the gross estate. In no case may the deduction on account of the mortgage or indebtedness exceed the liability therefor contracted bona fide and for an adequate and full consideration in money or money's worth. See sec. 20.2043-1. * * * It is not clear whether petitioner contends that the part of the regulation dealing with debts for which the estate is not liable is applicable here, although in effect the argument is made by way of arguing that the debts so far exceeded the value of the stock that the stock had a zero value. At the alternate valuation date the stock was not the primary security for any Cambridge Corporation debts. At that time the new financing agreement had been finalized providing for return of the stock over a 10-year period if the payments on the total indebtedness of $3,350,000 were kept current. Clearly, under this provision the payment of the $400,000 Cambridge Corporation indebtedness which the stock originally secured was not a prerequisite to the release of the stock, nor does it appear from this agreement that the return of the stock could be obtained by the payment of the $400,000 without the consent of the Bank.↩
4. Although respondent has stipulated that Mr. Fitzgerald, if called, would have given the opinions discussed above as his testimony, he reserved an objection to the admissibility of this evidence on grounds of relevancy. The Bank did not institute foreclosure proceedings until October 11, 1977, after the May 29, 1977, valuation date. Respondent also objected on the same basis to the allegations made by the Bank in its complaint as to the arrearages on the loans. We disagree with respondent that Mr. Fitzgerald's testimony and the allegations as to the amount of arrearages are irrelevant since we consider them relevant in casting light upon the circumstances in existence or to be reasonably anticipated as of the valuation date. However, the facts known or reasonably to be anticipated at the valuation date are controlling in determining the value of the stock.↩
5. Respondent seems to accept this proposition but nevertheless argues that his valuation in the notice of deficiency is correct. It is difficult to follow respondent's contentions since the mere fact that the estate would not receive release of the stock in full for a 10-year period is sufficient to establish that the stock did not have the value determined by respondent. Since Merck & Co. stock not subject to such an encumbrance could freely be purchased on the New York Stock Exchange, no knowledgeable buyer would pay the New York Stock Exchange price for pledged stock which would not be released in full for 10 years. Respondent relies primarily on . Respondent quotes the portion of this opinion (pages 601-602) which states that the securities pledged by the decedent to secure another's debt should be included in the estate at their value, but ignores the fact that the taxpayer in that case was allowed a deduction for the amount of the indebtedness which was secured by the securities paid by the estate during its administration. In that case, the Court concluded (at 603) that "This liability became fixed and determined during the administration of the decedent's estate and thereupon constituted an indebtedness in respect to property within the meaning of section 303(a)(1) of the 1926 Act, as amended." In effect, the Court treated the securities as if they secured an indebtedness of the estate to the extent the indebtedness was paid by the estate during administration. The Borland↩ case is totally distinguishable from the instant case and does not support the position taken by respondent. 1. ; ; Id., 10 Cir., , certiorari denied ; ; .↩
6. Although the return states that an appraisal of the stock was being done by the Bank, no appraisal by the Bank or by any other appraiser was offered into evidence at trial. Mrs. Hall testified that the Bank kept putting off making the appraisal until foreclosure proceedings were instituted, and that she never did receive the appraisal. This is a case obviously in which expert testimony would have been of aid to the Court. While petitioner has clearly shown that the stock in its pledged state was worth nowhere near the full value of similar, unencumbered shares, as stated above, we do not accept petitioner's contention that the shares had no value. As difficult as the valuation of the shares may be, the shares nevertheless must be valued for estate tax purposes on the basis of the evidence in the record. ↩